René P. Tatro (State Bar No. 78383)
Steven R. Tekosky (State Bar No. 109218)
David B. Sadwick (State Bar No. 126268)
TATRO TEKOSKY SADWICK LLP
333 S. Grand Avenue, Suite 4270
Los Angeles, CA  90071
Telephone:    (213) 225-7171
Facsimile:    (213) 225-7151
Email: rtatro@ttsmlaw.com
          stevetekosky@ttsmlaw.com
          dsadwick@ttsmlaw.com

Attorneys for Plaintiff
Venoco, LLC, formerly known as Venoco, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VENOCO, LLC, a Delaware limited liability company, formerly known as VENOCO, INC., | Case No. 2:16-cv-2988-PSG-JEM |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR:** |
| v. | (1) **Federal Oil Pollution Act of 1990 (Damages under 33 U.S.C. § 2702);** |
| PLAINS PIPELINE, L.P., a Texas limited partnership; PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership; PLAINS GP HOLDINGS, L.P., a Delaware limited partnership; PLAINS AAP, L.P., a Delaware limited partnership; PLAINS ALL AMERICAN GP LLC, a Delaware limited liability company; and PAA GP LLC, a Delaware limited liability company; | (2) **California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (Damages under Cal. Gov. Code § 8670.56.5);** (3) **Negligence/Gross Negligence;** (4) **Willful Misconduct;** (5) **Intentional Interference with Contractual Relations;** (6) **Interference with Prospective Economic Advantage; and** (7) **Declaratory Relief** |
| Defendants. | **JURY TRIAL DEMANDED** |

Tatro Tekosky
Sadwick LLP
ATTORNEYS AT LAW

## INTRODUCTION

1.       This is an action by plaintiff Venoco, LLC, formerly known as Venoco, Inc. ("Venoco") against Plains Pipeline, L.P. ("Plains"), its parent company Plains All American Pipeline, L.P. ("PAAPL"), and its parent company's general partners, Plains GP Holdings, L.P. ("Plains GP"), Plains AAP, L.P. ("Plains AAP"), Plains All American GP LLC ("PAAGP"), and PAA GP LLC (all defendants are referred to collectively herein as "Defendants") for, among other things, more than $20,000,000.00 in damages for loss of profits and/or earning capacity that Venoco has suffered, and is continuing to suffer, as a result of the rupture of, and injury to, the All American Pipeline (the "Pipeline" or "Line 901"), the resulting oil spill and damage to the environment and services, the resulting threat of further discharge and damage, and the resulting shut-down of the Pipeline, which occurred in this judicial district in Santa Barbara County, California. Venoco is informed and believes, and thereon alleges, that Defendants are, and have been at all times material to this lawsuit, the owners and operators of the Pipeline.

## JURISDICTION AND VENUE

2.       The action arises under the Federal Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.* ("OPA"), including, but not limited to, §§ 2702, 2713 and 2717. The action also arises under the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (the "California Act"), Cal. Gov. Code §§ 8670.1 *et seq.*, including, but not limited to, § 8670.56(a) and (h)(c). The California Superior Court for the County of Santa Barbara had subject matter jurisdiction over this action pursuant to 33 U.S.C. § 2717(c), which section gave that court original jurisdiction over claims for damages arising under OPA; pursuant to Cal. Gov. Code § 8670.59(a), which section gave that court jurisdiction over claims for damages arising under the California Act; and pursuant to Cal. Code of Civil Procedure § 410.10. This Court assumed jurisdiction over this case by virtue of Plains' removal of the initial complaint. This Court has jurisdiction over the California state law claims for relief of negligence/gross negligence, willful

misconduct, intentional interference with contractual relations, and interference with prospective economic advantage pursuant to 28 U.S.C. § 1367(a), which section confers supplemental jurisdiction over all other claims that form part of the same case or controversy as the claims over which this Court has original jurisdiction.

3.     Venue was proper in the California Superior Court for the County of Santa Barbara under Cal. Gov. Code § 8670.59(a) in that the rupture of, oil spill and discharge from, and injury to, Defendants' "Pipeline" and injury to services which are the subjects of this Second Amended Complaint, occurred within this judicial district. Venue was also proper in that court under Cal. Gov. Code Section § 8670.59(a) in that Defendants do business in Santa Barbara County. Venue was also proper in that court under 33 U.S.C. § 2717(b) in that the "discharge or injury or damages" at issue in this action occurred in this judicial district. Venue is proper in the United States District Court for the Central District of California by virtue of Plains' removal of the original complaint to this Court. Venue is also proper in this Court under 28 U.S.C. § 1391(b) in that the properties which are the subject of this Second Amended Complaint are located within this judicial district. Venue is also proper in this Court under 28 U.S.C. § 1391(b) in that a substantial portion, if not all, of the events, acts or omissions alleged in this Second Amended Complaint took place in this judicial district.

## THE PARTIES

4.     Venoco is a limited liability company incorporated under the laws of the State of Delaware. Venoco is qualified to conduct business in the State of California and produces crude oil, natural gas, and natural gas liquids at a Venoco-owned offshore platform "Holly" in the Santa Barbara Channel off the coast of Santa Barbara County, California pursuant to, and with, all legal rights and interests required to produce such crude oil, natural gas, and natural gas liquids and to vest ownership of that crude oil, natural gas, and natural gas liquids in Venoco.

5.     Venoco is informed and believes, and thereon alleges, that defendant Plains is a Texas limited partnership with its principal place of business located in

Houston, Texas. At the time of the injury to and rupture of the Pipeline, and the commencement of the crude petroleum release into the ocean and the other injuries alleged herein, the Pipeline was operated pursuant to a Local Tariff, F.E.R.C. No. 114.2.0, issued to Plains ("Local Tariff"), which required Plains to transport crude petroleum that meets the specifications in the Local Tariff subject to payment of the appropriate charges, without discrimination among shippers. Although Plains purported to cancel the relevant portion of the Local Tariff following the filing of this action, such cancellation was (if it is not invalidated) merely pretextual in an effort to avoid damages to Venoco.

6.     Venoco is informed and believes, and thereon alleges, that PAAPL is a Delaware limited partnership with its principal place of business located in Houston, Texas. PAAPL states as follows in its Form 10K: "we own and operate the All American Pipeline . . . . [W]e experienced a crude oil release from our Las Flores to Gaviota Pipeline (Line 901) in Santa Barbara . . . [and] our estimated undiscounted reserve for environmental liabilities (including liabilities related to the Line 901 incident, as discussed further below) totaled $185 million." The Failure Investigation Report issued by the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration ("PHMSA") states that "[a]t the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 . . . ."

7.     Venoco is informed and believes, and thereon alleges, that defendants Plains GP and Plains AAP are Delaware limited partnerships, and that defendants PAAGP and PAA GP LLC are Delaware limited liability companies, each with its principal place of business located in Houston, TX. Venoco is informed and believes, and thereon alleges, that each of these defendants is a general partner of PAAPL. PAAPL's 10K states that its general partner entities have "responsibility for conducting our business and managing our operations," and "employs [PAAPL's] management and operational personnel" which, on information and belief, includes the personnel who the PHMSA determined contributed to the oil spill and the inadequate response to the

rupture. As PAAPL states in its 10K, these general partner entities may enter into agreements with PAAPL that "are not necessarily the result of arms-length negotiations."

8.     Venoco is informed and believes, and thereon alleges, that at all times mentioned herein, Defendants, and each of them, were agents, partners, employees, representatives, subsidiaries, parents or affiliates of one another, and in doing the things alleged herein were acting within the course and scope of such position or positions, were acting with the knowledge, permission, approval and consent of each other, and were intending to act in furtherance of each other's endeavors as alleged herein.

9.     Venoco further is informed and believes and thereon alleges that there exists a unity of interest, ownership, and principal places of business as between PAAPL, Plains GP, Plains AAP, PAAGP, and PAA GP LLC (collectively, the "Operating Defendants") and Plains. The Defendants, thus, have and did hold themselves out as related in interest, ownership, and management and engaged in the direction and oversight, and the day-to-day operations of, the Pipeline, such that each of the Defendants should be liable to the same extent. Venoco is further informed and believes and thereon alleges that Plains was and is the agent of the Operating Defendants, and that the Operating Defendants exercised direction and oversight of Plains, including the day-to-day activities of Plains in connection with its operation of the Pipeline. Venoco is further informed and believes and thereon alleges that Plains can be legitimately described as a mere instrumentality through which the Operating Defendants acted in the operation of the Pipeline.

## FACTUAL BACKGROUND

**A.     Plaintiff Venoco's Oil Production and Defendants' Transportation of Oil.**

10.     Venoco produces crude oil at a Venoco-owned offshore platform "Holly" in the Santa Barbara Channel offshore the County of Santa Barbara, California. Incidentally to the crude oil production at its Holly platform, Venoco also produces natural gas and natural gas liquids pursuant to, and with, all legal rights and interests

required to produce such natural gas and natural gas liquids and to vest ownership of that natural gas and natural gas liquids in Venoco. This natural gas and natural gas liquids cannot reasonably and feasibly be produced without producing crude oil simultaneously with, and in conjunction with, the natural gas and natural gas liquids.

11.     Venoco's limited available storage capacity for crude oil produced at the Holly platform requires that all of the crude oil production from Venoco's Holly platform be transported through the Pipeline soon after the crude oil is extracted. Although Venoco has no contract with Defendants (and Defendants never requested or required any such contract), crude oil produced from Venoco's Holly platform had been transported through the Pipeline, with Defendants' knowledge, pursuant to and in accordance with the Local Tariff, until the Pipeline had to be shut down because of the rupture of and damage to Defendants' Pipeline and the direct and inevitable resulting discharge of oil (and substantial threat of discharge of oil) into the Pacific Ocean from the Pipeline caused by Defendants' conduct as described herein.

12.     Venoco is informed and believes and thereon alleges that its Holly platform is one of only four off-shore oil platforms that connect to Defendants' Pipeline; the other three platforms, which are also off the California coastline, are owned by Exxon Mobil. One of the key purposes of Defendants' Pipeline is to transport oil that is produced from these four platforms.

13.     Venoco is informed and believes and thereon alleges that Defendants are very large and sophisticated pipeline operators and know, and at all times material herein knew, what the oil transportation options are in the Santa Barbara area. State and Federal agencies make pipeline maps available to the public (for example, the U.S. Department of Transportation's National Pipeline Mapping System, www.npms.phmsa.dot.gov) which show the lack of an alternative pipeline to Defendants' Pipeline. Venoco is informed and believes and thereon alleges that Defendants, as very large and sophisticated pipeline operators, know, and at all times material herein knew, of these government oil pipeline maps, and knew there were no

alternative pipelines by which to transport oil produced from Venoco's Holly platform. Defendants at all relevant times knew and know that Venoco produces oil at the Holly platform and that the oil produced from the Holly platform is transported in Defendants' Pipeline. Defendants, therefore, knew that their failure to adhere to Pipeline Safety Regulations governing corrosion and pipeline maintenance (Title 49, Code of Federal Regulations) created a substantial threat of a discharge of oil—a threat that materialized on May 19, 2016 and continues currently—and knew that the substantial threat of discharge would inevitably damage Venoco's business by removing Venoco's only commercially viable means of transporting oil until the Defendants eliminated the risk of discharge.

14.     As Defendants knew and know, Venoco has a contract with Phillips 66 Company ("Phillips") pursuant to which Phillips purchases the crude oil that is produced from Venoco's Holly platform and transported through the Pipeline. On a monthly basis, Venoco sent an email to Defendants informing them how much oil would be delivered from the Holly platform into the Pipeline the following month. This monthly written process, known as "nominating," identified Phillips as the recipient of the oil that would be delivered into the Pipeline. Phillips was conspicuously copied on the monthly nominating process emails from Venoco to Defendants. Venoco is informed and believes, and thereon alleges, that Phillips sent Defendants a similar nomination form each month showing the volume of oil to be delivered from Venoco's Holly Platform to the Pipeline, with Phillips as the intended recipient. Venoco had a reasonable expectation that Phillips would continue to purchase the crude oil produced from its Holly platform and that, if Phillips did not do so for any reason, Venoco could and would sell such crude oil to another third party.

**B.    The Spill into the Pacific Ocean from the Pipeline.**

15.     Venoco is informed and believes, and thereon alleges, that Defendants constructed the Pipeline in 1987, at which time Santa Barbara County's Energy Division (the "County") ordered Defendants to install an automatic shut-off valve system on the

Pipeline to ensure it would shut down swiftly, without waiting for human action, at the first sign of a potential problem in the Pipeline. Venoco further is informed and believes that, rather than agree to these safety protocols, Defendants fought the County, arguing that the County lacked jurisdiction to regulate Defendants' pipeline design and installation. Venoco further is informed and believes that, as a result, Defendants' Pipeline is the only pipeline in Santa Barbara County that the County cannot monitor or inspect for safety.

16.     Venoco is informed and believes and thereon alleges that, since 2006, Plains has been cited for over 175 violations of safety requirements, causing nearly $24 million in property damage. Venoco is informed and believes and thereon alleges that eleven of those incidents were in California, and that Plains is one of the top four most-cited pipeline operators in the country. Defendants not only have a pattern and practice of shoddy safety and maintenance procedures on their pipelines, they have knowledge that the failure to properly maintain their pipelines creates a substantial threat of a discharge of oil that can cause damage to others and/or the environment.

17.     As of May 19, 2015, Defendants' lack of care for the proper maintenance of the Pipeline and/or extreme departure from what a reasonably careful person would do to prevent harm to the environment and others, willful misconduct, or other negligence, created a substantial threat of discharge of oil. That substantial threat of discharge exists now, rendering the Pipeline inoperable, and will continue to exist unless and until Defendants bring the corroded Pipeline into compliance with all applicable safety regulations.

18.     On or about May 19, 2015, as a result of Defendants' lack of care for the proper maintenance of the Pipeline and/or extreme departure from what a reasonably careful person would do to prevent harm to the environment and others, willful misconduct, or other negligence, pressurized oil in the corroded Pipeline ruptured it, damaging the Pipeline and causing a significant crude oil spill in Santa Barbara County,

California and into the Pacific Ocean, and added to the already extant substantial threat of further discharge of oil.

19.    The threat created by Defendants' lack of care for the proper maintenance of the Pipeline and/or extreme departure from what a reasonably careful person would do to prevent harm to the environment and others, willful misconduct, or other negligence, was "substantial" not only because of the likelihood of these things causing a discharge of oil, but also because of the magnitude of the harm that such a discharge would inevitably cause to the environment (in this biologically diverse and sensitive area) and to those depending on the Pipeline for commerce, such as Venoco.

20.    Venoco is informed and believes and thereon alleges that this rupture of the corroded Pipeline by pressurized oil and the simultaneous discharge of oil deposited over 140,000 gallons (approximately 3,400 barrels) of crude oil onto one of the most biologically diverse coastlines of the west coast, resulting in not only damage to the Pipeline, but significant damage to property and natural resources and injury to (*i.e.*, disruption of) services, and which included (but was not limited to) the thick crude oil that spilled, coating hundreds of animals along the coast, resulting in the death of many of these animals. Venoco further is informed and believes and thereon alleges that the spill reached nearly nine miles out into the Pacific Ocean, coated the county's coastline, impacted the fragile ecosystem of the Gaviota Coast and a Native American burial site. After the rupture by the pressurized oil, placing additional pressurized oil into the poorly maintained and corroded Pipeline (*i.e.*, continuing to use it, even with stop-gap repair measures) would have fit any definition of "substantial threat of discharge."

21.    The Pipeline and services on and related to the Pipeline were injured (*i.e.*, disrupted) when, as an inevitable and direct result of the rupture of the poorly-maintained and corroded Pipeline by pressurized oil, and the discharge of oil (and substantial threat of discharge of oil), Defendants shut down the Pipeline on May 19, 2015 to prevent further oil spillage from the ruptured Pipeline, because the ruptured Pipeline could not be operated without discharging oil. Because of the continued threat

of a substantial discharge of oil, the Pipeline has been inoperative since Defendants'
shut down of the Pipeline on May 19, 2015, and remains inoperative as of this date.
Venoco is informed and believes and thereon alleges that there is no date certain for the
resumption of the Pipeline's services or operations, but that Defendants intend to repair
or replace the Pipeline to eliminate the substantial threat of a further discharge of oil
and resume services and operations.

22.     Venoco is informed and believes, and thereon alleges, that, although
regular maintenance of pipelines is a crucial step that owners of pipelines must take in
order to avoid discharging oil, the substantial threat of discharging oil, threats of harm
to others and the environment and to avoid exactly the disaster (including the injury to
services resulting from the spill into the Pacific Ocean) that occurred, Defendants had
allowed the Pipeline to become severely corroded. Preliminary findings by PHMSA
show that an early May 2015 inspection of the Pipeline—just weeks prior to the May 19,
2015 spill—revealed "extensive external corrosion," noted that the Pipeline's walls had
been reduced by 54 to 74 percent of their original thickness, and noted that the Pipeline
had been reduced to 1/16 of an inch at the area where the pressurized oil breached the
Pipeline wall. PHMSA further found that Defendants failed to detect the corrosion and
failed to mitigate the corrosion; the inspection tool that Defendants used, and
Defendants' analysis of the data therefrom, did not accurately characterize the extent
and depth of the corrosion. These findings confirm the substantiality of the threat of
discharge that would attend operation of the Pipeline and thus mandate its closure, with
the inevitable effect of damaging Venoco.

23.     Venoco is informed and believes, and thereon alleges, that Defendants
repaired corrosion at three adjacent parts of the Pipeline in recent years, reflecting
awareness of the extent of the corrosion on the line and knowledge of how to address
it, but Defendants failed to take the necessary steps to repair the corroded section of the
Pipeline where the pressurized oil pushed through the Pipeline wall on May 19, 2015.
According to the Failure Investigation Report that PHMSA issued in May of 2016

regarding the May 19, 2015 Pipeline rupture (the "PHMSA Report"), the Pipeline

rupture occurred at an area of external corrosion that ultimately "failed in a single

event" under the operating oil pressure, such that the oil (under pressure while the

Pipeline was in operation) ruptured the Pipeline from the inside. *See*

http://www.phmsa.dot.gov/staticfiles/PHMSA/DownloadableFiles/Files/PHMSA_Fa

ilure_Investigation_Report_Plains_Pipeline_LP_Line_901_Public.pdf. In other words,

the oil (under pressure while the Pipeline was in operation) pushed through the

corroded and weakened portion of the Pipeline, and caused the rupture and resulting

discharge of oil. The PHMSA Report also reflects that corrosion exists elsewhere on the

Pipeline and confirms the substantiality of the threat of discharge that would attend

operation of the Pipeline and thus mandate its closure, with the inevitable effect of

damaging Venoco.

24.    Venoco is informed and believes, and on that basis alleges, that on

September 11, 2015, PHMSA issued a formal notice of probable violation and

compliance order against Defendants in light of a long-standing investigation. In its

notice, PHMSA stated that "as a result of the inspection, it appears that you have

committed probable violations of the Pipeline Safety Regulations, Title 49, Code of

Federal Regulations . . . . These findings and probable violations were determined prior

to the May 19, 2015 crude oil spill in Santa Barbara County, California." The notice

identifies the following six probable violations by Defendants, all of which (individually,

as well as collectively) confirm the substantiality of the threat of discharge that would

attend operation of the Pipeline and thus mandate its closure, with the inevitable effect

of damaging Venoco:

a.    Failure to maintain adequate documentation of pressure tests as part

of Defendants' baseline assessment plan for the seven breakout tanks at Pentland

Station in Kern County, California and failure to present any evidence of past

pressure tests performed on the breakout tanks to inspection teams. While some

evidence of testing from 1995 was ultimately presented, these did not confirm that the tests were performed in compliance with regulations;

b.      Failure to maintain adequate documentation of Defendants' preventative and mitigative evaluations prior to the 2013 calendar year for at least two different pipeline segments, and later stating that these records could not be found;

c.      Failure to adequately document consideration of preventive and mitigative measures nor explain why implementation of said measures was not executed in "High Consequence Areas;"

d.      Failure to present adequate documentation of Defendants' annual review of their emergency response training program, resulting in an ability to demonstrate an adequate review of training program objectives or the decision-making process for changes made to emergency response programs;

e.      Failure to present adequate documentation that would demonstrate that supervisors maintained a thorough knowledge of the portions of the emergency response procedure for which they are responsible and for which it is their job to ensure compliance; and

f.      Failure to maintain sufficient records to demonstrate that contractors met the required qualifications.

25.      Venoco is informed and believes, and on that basis alleges, that in addition to the above probable violations, the PHMSA also cited three additional areas of safety concern, all of which (individually, as well as collectively) confirm the substantiality of the threat of discharge that would attend operation of the Pipeline and thus mandate its closure, with the inevitable effect of damaging Venoco:

a.      Defendants' failure to fully discuss or document how tool tolerance was addressed or how measured anomalies that deviated significantly from the size predicted by the tool were addressed;

b.   Defendants' failure to completely document Management of Change for pressure reduction; and

c.   Defendants' failure to comply with Defendants' responsibility to educate emergency response officials as part of a Public Awareness Program.

26.   Venoco is informed and believes, and thereon alleges, that, as a result of these findings confirming the substantiality of the threat of discharge that would attend operation of the Pipeline (and thus mandate its closure, with the inevitable effect of damaging Venoco), the PHMSA issued a Proposed Compliance Order demanding that Defendants take action to remediate the above probable violations and safety concerns. In the PHMSA Report detailing the results of its investigation into the Pipeline rupture and resulting discharge of oil, PHMSA identified three primary categories of causes, as follows, all of which (individually, as well as collectively) confirm the substantiality of the threat of discharge that would attend operation of the Pipeline and thus mandate its closure, with the inevitable effect of damaging Venoco:

a.   Defendants' "[i]neffective protection against external corrosion of the pipeline,"—*i.e.*, Defendants' cathodic protection system, which is required under federal Pipeline Safety Regulation 49 C.F.R. § 195.563 to prevent external corrosion of buried pipelines, was ineffective and inconsistent with industry practices;

b.   "Failure by Defendants to detect and mitigate the corrosion": the PHMSA Report explains that Defendants failed to identify corrosion "as a risk-driving threat in their federally-mandated integrity management program (IMP)" and "did not apply sufficient mitigative strategies to prevent" the corrosion that caused the rupture.

c.   "Defendants' lack of timely detection of the rupture."

27.   The PHMSA Report notes that as part of its federally-mandated IMP, and pursuant to 49 CFR Part 195.452(b)(6), operators must "[f]ollow recognized industry

Tatro Tekosky
Sadwick LLP
ATTORNEYS AT LAW

practices," including "work[ing] intimately with the ILI [in-line-inspection] vendor to obtain useable information about their pipeline system." The PHMSA Report found, however, that Defendants failed to "fully implement their IMP" and did not provide evidence of required communications with its ILI vendor. The PHMSA Report found that these failures contributed to large discrepancies between the actual corrosion levels on its ruptured pipeline and the corrosion levels predicted by its analysis of its in-line-inspection data, noting that the "in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately." All of these findings (individually, as well as collectively) confirm the substantiality of the threat of discharge that would attend operation of the Pipeline, and thus mandate its closure, with the inevitable effect of damaging Venoco.

28.    The PHMSA Report's conclusion, which was echoed publicly by the United States Department of Transportation ("DOT"), was that "[a]lthough the operational events that occurred on the morning of the release were abnormal, *this should not have caused the release if the pipeline's integrity had been maintained to federal standards.*" This conclusion confirms the substantiality of the threat of discharge that would attend operation of the Pipeline, and thus mandate its closure, with the inevitable effect of damaging Venoco.

29.    The U.S. DOT press release accompanying the PHMSA Report likewise states as follows, which statements, alone and collectively, confirm the substantiality of the threat of discharge that would attend operation of the Pipeline, and thus mandate its closure, with the inevitable effect of damaging Venoco:

a.    "PHMSA's investigation reveals that *a number of preventable errors led to this incident*, and that the company's [i.e., Defendants'] failures in judgment, including inadequate assessment of the safety of this line and faulty planning made matters worse,"

b. "This report confirms our preliminary findings on the cause of this incident, and reveals that *the operator* [i.e., Defendants] *failed on multiple levels to prevent, detect and respond to this incident.*"

30.    Venoco is informed and believes and thereon alleges that Defendants had turned off an alarm that would have signaled a leak on the Pipeline, and that Defendants even temporarily restarted the damaged and oil-ruptured Pipeline, compounding the spill and injuries, and further exacerbating (and underscoring) the substantial threat of discharge that would attend operation of the Pipeline. Venoco is further informed and believes and thereon alleges that PHMSA identified a number of preventable errors by Defendants, including inaccurate assessment of data, inadequate maintenance of the Pipeline, and faulty planning. These errors created the substantial the threat of discharge that would attend operation of the Pipeline, and thus mandate its closure, with the inevitable effect of damaging Venoco. These errors also led to the pressurized oil rupturing the Pipeline and resulting injury.

31.    Venoco is informed and believes and thereon alleges that, on May 16, 2016, a grand jury indicted PAAP and one of its employees on 46 criminal charges arising out of the pressurized oil rupturing the corroded Pipeline and the resulting spill, including four felony charges and 42 misdemeanor charges. Many of the things which are the subject of the grand jury indictments alone and collectively, confirm the substantiality of the threat of discharge that would attend operation of the Pipeline, and thus mandate its closure, with the inevitable effect of damaging Venoco.

**C.    Venoco's Resulting Damages.**

32.    The damages which follow from any discharge of oil are a function of the unique circumstances of the discharge. In some circumstances, damages inevitably follow directly from the discharge. For example, if discharged oil pools around a place of business, it inevitably directly follows that the business will be interrupted while the release, and/or threat of further release, is addressed. In other circumstances, damages

are indirect and fortuitous. For example, a release could—but very possibly may not and certainly does not inevitably—lead to a fire.

33.     Like pooling oil following a release, the oil discharged into the Pacific Ocean and elsewhere from the ruptured and injured Pipeline, and the substantial threat of further discharges, directly and inevitably caused an interruption of Venoco's business while Defendants shut down the operation of the ruptured Pipeline to address the threat of further releases.

34.     Likewise, the damages which follow from a substantial threat of a discharge of oil are a function of the unique circumstances that are threatened to occur if the discharge occurs. In some circumstances, damages inevitably follow directly from the substantial threat of discharge. For example, if stopping a substantial threat necessitates cutting off access to a place of business, it inevitably directly follows that the business will be interrupted while the threat of release is addressed. In other circumstances, damages are not inevitable. For example, some substantial threats of release might not inevitably lead to interrupting a business while the threat is addressed (e.g., if the business had an alternative means of ingress and egress).

35.     Like a substantial threat of release which necessarily interrupts access, the substantial threat of discharges from the Pipeline, together with the actual discharges and the damage to the Pipeline arising therefrom, directly and inevitably caused an interruption of Venoco's business because the threat of further discharges necessitated shutting down the operation of the oil-ruptured Pipeline. In particular, since the Pipeline's rupture on or about May 19, 2015, which was the direct and inevitable result of the pressurized oil and lack of proper maintenance, and as a direct and inevitable result of both the discharge of the pressurized oil into the Pacific Ocean and elsewhere and the necessary shutdown of the operation of the ruptured Pipeline caused by the substantial threat of additional releases, crude oil produced from Venoco's Holly platform has not been allowed to be transported through the Pipeline, causing injury to Venoco. As a consequence, since on or about May 19, 2015, Venoco has not produced

crude oil, natural gas, or natural gas liquids from its Holly platform, has not serviced its sales contract with Phillips, and the Holly platform has been "shut in." Similarly, as a result of the discharge of oil, the substantial threat of discharge of oil, the damage to the Pipeline arising therefrom, and the resulting injury to services, Venoco has been unable to sell crude oil to Phillips or anyone else.

36.     If Venoco continued to produce crude oil from the Holly platform after the pressurized oil ruptured the Pipeline and/or after the Pipeline was shut down to address the discharges and substantial threat of a discharge, and services were injured (*i.e.*, disrupted) as described herein (which also caused Venoco to be unable to service its contract with Phillips), Venoco would be unable to store or transport such crude oil.

37.     Since services on the Pipeline, and Venoco's ability to service the Phillips contract, were injured on or about May 19, 2015, and continuing at least to the present date, Venoco has had no commercially viable and available alternative mode of transporting the crude oil produced by its Holly platform, and has had no commercially viable and available alternative mode of storing the crude oil produced by its Holly platform.

38.     Venoco's Holly platform has been, and remains, shut-in as a result of the discharges from the damaged Pipeline, the substantial threat of discharge of oil and/or pressurized oil rupturing the Pipeline and discharging oil described above and the inevitable shutdown of the Pipeline by Defendants on that same day, which disrupted services on or related to the Pipeline and prevented the production, transportation, and sale of crude oil, natural gas, and natural gas liquids from Venoco's Holly platform, and thereby disrupted and interfered with the Phillips contract.

39.     Every day that Venoco's Holly platform remains shut-in as a result of the discharges from the damaged Pipeline, the substantial threat of discharge of oil and/or pressurized oil rupturing the Pipeline and discharging oil described above, and the inevitable shutdown of the Pipeline, the injury to and disruption of services on or

related to the Pipeline (and to the Phillips contract), causes Venoco to incur lost profits and impairment of earning capacity damages.

40.     For the time period of May 19, 2015 through the date of this filing, Venoco's damages for loss of profits and/or earning capacity, arising from the substantial threat of discharge of oil and/or pressurized oil rupturing the Pipeline and discharging oil described above and the inevitable shutdown of the ruptured Pipeline and the resulting disruption of services on or related to the Pipeline  (and to the Phillips contract), exceed $20,000,000.00. Venoco continues to incur damages each day the Pipeline remains ruptured and services (and the Phillips contract) are disrupted. Venoco will continue to incur damages at least as long as the shut-in of its Holly platform continues.

41.     Venoco has, from May 19, 2015 through May 31, 2016, incurred reasonable financial and accounting expert costs of not less than $113,160.00 for providing assistance to Venoco to assess Venoco's loss of profits and/or earning capacity resulting from the releases of oil from the damaged Pipeline, the substantial threat of discharge of oil and/or pressurized oil rupturing the Pipeline and discharging oil, and the inevitable shutdown of the ruptured Pipeline by Defendants.

**C.     Defendants' Refusal to Pay Monies Owed to Venoco.**

42.     On December 31, 2015, Venoco presented to Plains a notice of claim under Plains' Local Tariff and a claim ("the Claim") within the meaning of Section 1001(3) of OPA, 33 U.S.C. § 2701(3). The Claim was in the amount of $12,417,460.00 for lost profit and impairment of earning capacity damages from May 19, 2015 through November 30, 2015, and, from May 19, 2015 through December 23, 2015, $108,900.50 for the reasonable cost of estimating the lost profit and impairment of earning capacity damages claimed by Venoco due to and resulting from the releases of oil from the corroded Pipeline, the substantial threat of discharge of oil and/or pressurized oil rupturing the Pipeline and discharging oil, and the damage to the Pipeline arising therefrom described above, including injury to the Pipeline and to Pipeline services (and

services to the Phillips contract). Contemporaneously, with the filing of the First Amended Complaint, Venoco presented to Defendants an updated notice of claim under the Local Tariff and an updated Claim.

43.     To date, Defendants have not paid, or committed to pay, Venoco's Claim.

## FIRST CLAIM FOR RELIEF

### Damages under 33 U.S.C. § 2702 against all Defendants

44.     Venoco incorporates Paragraphs 1 through 43, inclusive, as though set forth fully herein.

45.     OPA's accompanying regulations state that OPA's goal "is to make the environment *and public* whole for injuries to natural resources *and services* resulting from an incident involving a discharge *or substantial threat of a discharge of oil* (incident)." 15 C.F.R. § 990.10 (emphasis added).

46.     Section 1001(14) of OPA, 33 U.S.C. § 2701(14) defines "incident" to mean "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil[.]"

47.     Section 1002(a) of OPA (OPA's liability provision) provides: "Notwithstanding any other provision or rule of law, and subject to the provisions of this chapter, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) *that result from such incident.*" 33 U.S.C. § 2702(a) (emphasis added).

48.     Section 1002(b)(2)(E) of OPA, in turn, provides that the damages referred to in subsection (a) include "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

49.     Venoco is, and has been at all times material hereto, a "person" within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27). Venoco is informed and believes and on that basis alleges that each of the Defendants is a "person" within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

50.     Defendants' Pipeline in Santa Barbara County, California is, and has been at all times material hereto, a "facility" within the meaning of Section 1001(9) of OPA, 33 U.S.C. § 2701(9).

51.     Defendants' Pipeline in Santa Barbara County, California is, and has been at all times material hereto, an "onshore facility" within the meaning of Section 1001(24) of OPA, 33 U.S.C. § 2701(24).

52.     Venoco is informed and believes, and thereon alleges, that starting on an exact date currently unknown to Venoco, but including the timeframe from on or about May 19, 2015 to the current date, and including all times material hereto, each Defendant was (and is) an "operator" of a facility, to wit: the Pipeline, within the meaning of Section 1001(26) of OPA, 33 U.S.C. § 2701(26).

53.     Venoco is informed and believes, and thereon alleges, that starting on an exact date currently unknown to Venoco, but including the timeframe from on or about May 19, 2015 to the current date, and including all times material hereto, each Defendant was (and is) an "owner" of a facility, to wit: the Pipeline, within the meaning of Section 1001(26) of OPA, 33 U.S.C. § 2701(26).

54.     Venoco is informed and believes, and thereon alleges, that starting on an exact date currently unknown to Venoco, but including the timeframe from on or about May 19, 2015 to the current date, and including all times material hereto, each Defendant was (and is) a "responsible party" within the meaning of Section 1001(32) of OPA, 33 U.S.C. § 2701(32).

55.     Crude oil is "oil" within the meaning of Section 1001(23) of OPA, 33 U.S.C. § 2701(33).

56.     "Navigable waters" means "navigable waters" within the meaning of Section 1001(21) of OPA, 33 U.S.C. § 2701(21).

57.     Venoco is a "claimant" within the meaning of Section 1001(4) of OPA, 33 U.S.C. § 2701(4), and pursuant to 33 C.F.R. § 136.231(a).

58.     On or around May 19, 2015, in Santa Barbara County, California, oil was discharged within the meaning of Section 1001(7) of OPA, 33 U.S.C. § 2701(7), into or upon the navigable waters and/or adjoining shorelines from the rupture of, and injury to, Defendants' Pipeline. Commencing on or around May 19, 2015, in Santa Barbara County, California, pressurized oil breached the corroded wall of the Pipeline, and oil was discharged within the meaning of Section 1001(7) of OPA, 33 U.S.C. § 2701(7), into or upon the navigable waters and/or adjoining shorelines from the rupture of, and injury to, Defendants' Pipeline.

59.     Prior to and leading up to the rupture of the Pipeline on May 19, 2015 (and at any time thereafter to the extent Defendants attempted to operate the Pipeline without adequate repair and maintenance), as a result of Defendants' failure to properly maintain the Pipeline, Defendants' facility posed the substantial threat of discharge of oil into or upon the navigable waters and/or adjoining shorelines.

60.     Under the provisions of Section 1001(14) of OPA, the "incident" in this case may be defined as the pressurized oil rupturing the corroded Pipeline, because that rupture was caused by and resulted in the "discharge of oil" and damage to the Pipeline, and the Pipeline shutdown arose from the discharge and was inevitable and necessary to stop such discharge and to prevent further discharge. As the owners and/or operators of the Pipeline at all times material hereto, each Defendant is liable and responsible for damages specified under Section 1002(a) and (b)(2)(E) of OPA, 33 U.S.C. § 2702(a) and (b)(2)(E), that result from the "incident."

61.     In addition and/or in the alternative, under the provisions of Section 1001(14) of OPA, "incident" in this case also may be defined as Defendants' ownership and operation of an improperly maintained Pipeline (a facility) containing pressurized

oil, which resulted in the discharge of oil (which pushed through the corroded portion of the Pipeline) as well as the inevitable and necessary damage to the Pipeline and shutdown of the Pipeline. In addition and/or in the alternative, under the provisions of Section 1001(14) of OPA, "incident" in this case also may be defined as the Defendants' ownership and operation of an improperly maintained Pipeline (a facility) containing pressurized oil , which created the substantial threat of further discharge of oil, and the inevitable and necessary shutdown of the Pipeline to prevent the substantial threat of discharge from occurring. As the owners and/or operators of the Pipeline at all times material hereto, each Defendant is liable and responsible for damages specified under Section 1002(a) and (b)(2)(E) of OPA, 33 U.S.C. § 2702(a) and (b)(2)(E), that result from the "incident," as defined.

62.     As alleged above, Defendants' shutdown of the Pipeline on May 19, 2015 followed directly and inevitably from the discharge of oil, the substantial threat of discharge, and/or because the Pipeline's rupture by pressurized oil meant the ruptured Pipeline could not be operated without causing further oil discharges. Unlike the examples above in which a substantial threat of a discharge or a discharge may, but does not inevitably, cause an outcome (*e.g.*, a business interruption or a fire), the Pipeline shutdown was the inevitable result of the discharge and/or substantial threat of discharge of oil from the oil-ruptured and improperly-maintained Pipeline, and Venoco's damages inevitably resulted therefrom.

63.     Venoco has suffered damages at least equal to the loss of profits and impairment of earning capacity resulting from the "incident" or "incidents" identified above due to and resulting from the injury to the Pipeline in an amount to be proven at trial, which amount grows on a daily basis, but which to date amount exceeds $20,000,000, for which Defendants are liable pursuant to Section 1002(a) and (b)(2)(E) of OPA, 33 U.S.C. § 2702( a) and (b)(2)(E).

64.     Defendants are liable to plaintiff Venoco for loss of profits and impairment of earning capacity resulting from the "incident" or "incidents" described

above due to and resulting from the injury, destruction, or loss of real property, personal property, or natural resources pursuant to Section 1002(a) and (b)(2)(E) of OPA, 33 U.S.C. § 2702(a) and (b)(2)(E). Venoco is also entitled to a declaratory judgment establishing the liability of each Defendant for all past and future damages for loss of profits or impairment of earning capacity resulting from the "incident" or "incidents" identified above.

**SECOND CLAIM FOR RELIEF**

**Damages under Cal. Gov. Code § 8670.56.5 against all Defendants**

65.     Venoco incorporates Paragraphs 1 through 64, inclusive, as though set forth fully herein.

66.     Venoco is, and has been at all times material hereto, a "person" within the meaning of Cal. Gov. Code Section 8670.3(s). Venoco is informed and believes, and on that basis alleges, that each of the Defendants is, and has been at all times material hereto, a "person" within the meaning of Cal. Gov. Code Section 8670.3(s).

67.     Defendants' Pipeline in Santa Barbara County, California is, and has been at all times material hereto, a "facility" within the meaning of Cal. Gov. Code Section 8670.3(g)(1).

68.     Venoco is informed and believes, and thereon alleges, that starting on an exact date currently unknown to Venoco, but including the timeframe from on or about May 19, 2015 to the current date, and including all times material herein, each Defendant was (and is) an "operator" of a facility, to wit: the Pipeline, within the meaning of Cal. Gov. Code Section 8670.3(r)(1).

69.     Venoco is informed and believes, and thereon alleges, that starting on an exact date currently unknown to Venoco, but including the timeframe from on or about May 19, 2015 to the current date, and including all times material herein, each Defendant was (and is) an "owner" of a facility, to wit: the Pipeline, within the meaning of Cal. Gov. Code Section 8670.3(r)(1).

70.     Venoco is informed and believes, and thereon alleges, that starting on an exact date currently unknown to Venoco, but including the timeframe from on or about May 19, 2015 to the current date, and including all times material herein, each Defendant was (and is) a "responsible party," within the meaning of Cal. Gov. Code Section 8670.3(w)(1).

71.     Crude oil is "oil" within the meaning of Cal. Gov. Code Section 8670.3(n).

72.     "Waters of the state" means "waters of the state" within the definition of Cal. Gov. Code Section 8670.3(ag).

73.     On or around May 19, 2015, in Santa Barbara County, California, oil was discharged within the meaning of Cal. Gov. Code Section 8670.3(aa) into or upon the waters of the state from the rupture of, and injury to, Defendants' Pipeline, which at all times material herein is and was a "pipeline" within the meaning of Cal. Gov. Code Section 8670.3(t).  As each Defendant was at all times material herein the owner and or operator of the Pipeline, and the responsible party for the discharge of the oil from the Pipeline, each Defendant is liable and responsible for damages specified under Cal. Gov. Code Section 8670.56.5(a) and (h)(6) that result from the discharge of oil when pressurized oil in Defendants' poorly-maintained Pipeline ruptured the wall of the Pipeline, and the inevitable shutdown of the Pipeline resulting from that oil-caused rupture and discharge of oil.

74.     Venoco has suffered damages equal to the loss of profits and impairment of earning capacity arising out of or caused by the inevitable shutdown of the Pipeline resulting from the discharge of oil when pressurized oil in Defendants' Pipeline ruptured the wall of the Pipeline and discharged to the waters of the Pacific Oceana and elsewhere in an amount to be proven at trial, which amount grows on a daily basis, but which amount, to date, exceeds $20,000,000. Defendants are liable to Venoco for such damages pursuant to Cal. Gov. Code Section 8670.56.5(a) and (h)(6). Venoco derived at least 25% of its earnings from activities that utilized the property or natural resources

injured, destroyed or lost, including the Pipeline and services on or related to the Pipeline.

75.     Defendants are liable to plaintiff Venoco for loss of profits and impairment of earning capacity resulting from the inevitable shutdown of the Pipeline resulting from the injury to Defendants' Pipeline and the discharge of oil from Defendants' ruptured Pipeline into the waters of the Pacific Ocean and elsewhere pursuant to Cal. Gov. Code Section 8670.56.5(a) and (h)(6). Venoco is also entitled to a declaratory judgment establishing the liability of Defendants for all past and future damages for loss of profits and impairment of earning capacity resulting from the inevitable shutdown of the Pipeline resulting from the discharge of oil when pressurized oil in Defendants' Pipeline ruptured the wall of the Pipeline and was discharged to the waters of the Pacific Ocean and elsewhere.

76.     Defendants are liable to plaintiff Venoco for reasonable costs of suit, attorneys' fees, and the costs of necessary expert witnesses pursuant to Cal. Gov. Code Section 8670.56.5(f).

### THIRD CLAIM FOR RELIEF

### For Negligence/Gross Negligence against all Defendants

77.     Venoco incorporates Paragraphs 1 through 76, inclusive, as though set forth fully herein.

78.     Defendants owed a duty of care to Venoco to exercise reasonable and ordinary care in maintaining and operating the Pipeline in good and working condition so as to avoid a rupture thereof and injury thereto, and so as to avoid a discharge of oil (and substantial threat of a discharge of oil) as described herein that resulted in injury to (*i.e.*, disruption of) services on and related to the Pipeline. That duty arose from, among other things, federal, state, and local laws that require Defendants to operate a pipeline in a manner that does not damage public health and safety, as well as the Local Tariff, pursuant to which Defendants operated as common carriers. Defendants' Pipeline,

moreover, had a sole purpose: to transport oil from platforms such as the Holly platform.

79.     Defendants knew or should have known that if they failed to exercise reasonable care in maintaining and operating the Pipeline in good and working condition and/or in accordance with federal, state, and local law, the Pipeline could rupture or otherwise fail, resulting in a discharge of oil (and substantial threat of a discharge of oil) and disruption of services, as described herein, and damage would result to Venoco in connection with Venoco's Holly platform being shut-in. Venoco's loss of use of the Holly platform was a direct, foreseeable, inevitable, and necessary consequence of Defendants' negligence and/or gross negligence.

80.     Defendants breached, and are continuing to breach, their duty of care to Venoco by failing to maintain, monitor, and operate the Pipeline in good and working condition, resulting in the rupture of the Pipeline, a significant release of pressurized crude oil, and injury to (*i.e.*, disruption of) services and operations of and related to the Pipeline, and further resulting in Venoco's Holly platform being shut-in.

81.     In addition, in so doing, Defendants violated several statutes, ordinances, or regulations, including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, Cal. Fish & Game Code Section 5650, *et seq.*, the Federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and state and federal spill response and notification laws, which are designed to prevent the type of rupture and discharge of oil (and substantial threat of a discharge of oil) that occurred on Defendants' Pipeline.

82.     As a proximate result of Defendants' negligence and/or gross negligence and violations of statutes, ordinances, and/or regulations as herein alleged, Venoco has been, and will continue to be, injured, harmed and damaged in an amount to be proven at trial, which amount grows on a daily basis, but which amount, to date, exceeds $20,000,000.

## **FOURTH CLAIM FOR RELIEF**

### **For Willful Misconduct against all Defendants**

83.     Venoco incorporates Paragraphs 1 through 82, inclusive, as though set forth fully herein.

84.     Defendants had actual or constructive knowledge of the corrosion of the Pipeline.

85.     Defendants had actual or constructive knowledge that the corrosion of the Pipeline, in combination with the pressurized oil traveling through it, created a significant peril to the environment and others, including Venoco.

86.     Defendants had actual or constructive knowledge that injury to Venoco in connection with Venoco's Holly platform being shut-in was a likely and highly and substantially probable result of the rupture of the Pipeline and the resulting discharge of oil (and substantial threat of a discharge of oil) and injury to services on or related to the Pipeline.

87.     Defendants unreasonably, and in disregard of the known risks or risks so obvious Defendants must have been aware of them, consciously failed to act to avoid the damage to and rupture of the Pipeline (and the resulting discharge of oil (and substantial threat of a discharge of oil) and injury to services on or related to the Pipeline) and resulting harm to the environment and, among others, Venoco.

88.     As a proximate result of Defendants' conduct as herein alleged, Venoco has been, and will continue to be, injured, harmed and damaged in an amount to be proven at trial, which amount grows on a daily basis, but which amount, to date, exceeds $20,000,000.

89.     Defendants acted with malice, *i.e.*, despicable conduct carried on with a willful and conscious disregard of the rights or safety of others, and oppression, *i.e.*, despicable conduct subjecting Venoco to cruel and unjust hardship in conscious disregard of its rights.

## FIFTH CLAIM FOR RELIEF

### For Intentional Interference with Contractual Relations against all Defendants

90.   Venoco incorporates Paragraphs 1 through 89, inclusive, as though set forth fully herein.

91.   Venoco had a valid contract and an economic relationship with Phillips by which Venoco sold, and Phillips purchased, crude oil produced from Venoco's Holly platform.

92.   Defendants knew of Venoco's contract and economic relationship with Phillips.

93.   Defendants knew that their conduct in failing to properly maintain, monitor, and operate the Pipeline, and/or discharging crude oil (and/or causing a substantial threat of a discharge of oil) would inevitably result in the Pipeline's shutdown and cause injury to (*i.e.*, disruption of) services on or related to the Pipeline. Defendants also knew that Venoco's contract with Phillips necessarily required Phillips to be able to transport the oil purchased from Venoco through the Pipeline. Defendants also knew that without access to the Pipeline, such transportation would be too expensive and/or not feasible. Accordingly, Defendants knew that the disruption of and interference with Venoco's contract with Phillips was certain or substantially certain to occur as a result of their conduct.

94.   Defendants were negligent, grossly negligent, and consciously failed to act to avoid the damage to and rupture of the Pipeline (and the resulting discharge of oil (and substantial threat of a discharge of oil) and injury to (*i.e.*, disruption of) services on or related to the Pipeline) and resulting harm to the environment and, among others, Venoco, by failing to properly maintain, monitor, and operate the Pipeline in good and working condition.

95.   Defendants' conduct as described herein resulted in the rupture of the Pipeline, a significant crude oil discharge (and substantial threat of a discharge of oil), injury to services on and related to, and disruption of operations of, the Pipeline, and

27

resulted in Venoco's Holly platform being shut-in and Venoco's contractual relationship with Phillips being disrupted and interfered with inasmuch as Venoco has been unable to sell crude oil from its Holly platform to Phillips.

96.     As a proximate result of Defendants' conduct as herein alleged, Venoco has been, and will continue to be, injured, harmed and damaged in an amount to be proven at trial, which amount grows on a daily basis, but which amount, to date, exceeds $20,000,000.

### SIXTH CLAIM FOR RELIEF

**For Interference with Prospective Economic Advantage against all Defendants**

97.     Venoco incorporates Paragraphs 1 through 96, inclusive, as though set forth fully herein.

98.     An economic relationship existed between Venoco and Phillips which contained a reasonably probable future economic benefit or advantage to Venoco, by which Venoco would sell, and Phillips would purchase, crude oil produced from Venoco's Holly platform. Venoco had a reasonable expectation that Phillips would continue to purchase the crude oil produced from its Holly platform and that, if Phillips did not do so for any reason, Venoco could and would sell such crude oil to another third party.

99.     Defendants knew of the existence of Venoco's relationship with Phillips, and of the reasonable expectation that the crude oil produced from Venoco's Holly platform could and would be sold to another third party if Phillips did not continue to purchase it for any reason.

100.    Defendants knew or should have known that if they did not act with due care, their actions would interfere with Venoco's relationship with Phillips and/or other third party, and cause Venoco to lose, in whole or in part, the probable future economic benefit or advantage of the relationship. Defendants knew that Venoco's relationship with Phillips and/or other third party would necessarily require Phillips (or other third party) to be able to transport the oil purchased from Venoco through the Pipeline.

Defendants also knew that without access to the Pipeline, such transportation would be too expensive and/or not feasible. Accordingly, Defendants knew that the disruption of and interference with Venoco's economic relationship with Phillips and/or other third party was certain or substantially certain to occur as a result of their conduct.

101.    Defendants were negligent, grossly negligent, and consciously failed to act to avoid the damage to and rupture of the Pipeline (and the resulting discharge of oil and injury to services on or related to the Pipeline) and resulting harm to the environment and others, including Venoco, by failing to properly maintain, monitor, and operate the Pipeline in good and working condition.

102.    Defendants' conduct resulted in the rupture of the Pipeline, a significant crude oil discharge (and substantial threat of a discharge of oil), injury to services on and related to, and disruption of operations of, the Pipeline, and further resulted in Venoco's Holly platform being shut-in and caused Venoco's relationship with Phillips or other third-party to be disrupted inasmuch as Venoco has been unable to sell crude oil from its Holly platform to Phillips or anyone else.

103.    As a proximate result of Defendants' conduct, Venoco has been, and will continue to be, injured, harmed and damaged in an amount to be proven at trial, which amount grows on a daily basis, but which amount, to date, exceeds $20,000,000.

## SEVENTH CLAIM FOR RELIEF

### For Declaratory Relief against all Defendants

104.    Venoco incorporates Paragraphs 1 through 103, inclusive, as though set forth fully herein.

105.    An actual, substantial, and justiciable controversy exists between Venoco and each Defendant regarding their respective rights and obligations for further damages that will be incurred by Venoco in connection with Venoco's Holly platform being shut-in by the injury to (*i.e.*, disruption of) services resulting from the rupture of Defendants' Pipeline involving a discharge of oil.

106.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202,

Venoco seeks a declaratory judgment against each Defendant that will be binding in any subsequent action to recover further damages, including pursuant to Section 1002(a) and (b)(2)(E) of OPA, 33 U.S.C. § 2702( a) and (b)(2)(E), pursuant to Cal. Gov. Code Section 8670.56.5(a) and (h)(6), and pursuant to California common law, holding each Defendant strictly liable for all further damages for loss of profits and impairment of earning capacity to be incurred by Venoco in connection with Venoco's Holly platform being shut-in by the injury to (*i.e.*, disruption of) services resulting from the rupture of Defendants' Pipeline involving a discharge of oil.

107.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Venoco seeks a declaratory judgment against each Defendant that will be binding in any subsequent action to recover further damages pursuant to Cal. Gov. Code Section 8670.56.5(a) and (h)(6), holding each Defendant strictly liable for all further damages for loss of profits and impairment of earning capacity to be incurred by Venoco in connection with the injury to Defendants' Pipeline and to the services of thereof.

108.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Venoco seeks a declaratory judgment against each Defendant that will be binding in any subsequent action, holding each Defendant liable to Venoco for negligence/gross negligence, willful misconduct, interference with contractual relations, and interference with prospective economic advantage, for all further damages for loss of profits and impairment of earning capacity to be incurred by Venoco in connection with Venoco's Holly platform being shut-in by the injury to (*i.e.*, disruption of) services resulting from the rupture of Defendants' Pipeline involving a discharge of oil and significant threat of further discharge.

## **PRAYER FOR RELIEF**

104.    Wherefore, Venoco prays for judgment as follows:

a.  That Defendants are liable to Venoco for all damages for loss of profits and impairment of earning capacity incurred, and to be incurred, by Venoco in connection with Venoco's Holly platform being shut-in

because of the pressurized oil in Defendants' corroded Pipeline rupturing and injuring the Pipeline, causing discharge of oil and/or because of the substantial threat of further discharge of oil caused by Defendants' failure to maintain the Pipeline described above, and the resulting injury to services on or related to the Pipeline;

b. For the reasonable cost of estimating the lost profit and impairment of earning capacity damages claimed by Venoco because of the pressurized oil in Defendants' corroded Pipeline rupturing and injuring the Pipeline, causing discharge of oil and/or because of the substantial threat of further discharge of oil caused by Defendants' failure to maintain the Pipeline described above and the resulting injury to services on or related to the Pipeline;

c. For compensatory damages in an amount to be proven at trial;

d. For reasonable costs of suit, attorneys' fees, and the costs of necessary expert witnesses pursuant to Cal. Gov. Code Section 8670.56.5(f);

e. For a declaration against Defendants holding each Defendant strictly liable for all further damages pursuant to pursuant to Section 1002(a) and (b)(2)(E) of OPA, 33 U.S.C. § 2702( a) and (b)(2)(E) for loss of profits and impairment of earning capacity incurred, and to be incurred, by Venoco in connection with Venoco's Holly platform being shut-in because of the incident and/or incidents described;

f. For a declaration against Defendants holding each Defendant strictly liable for all further damages pursuant to Cal. Gov. Code Section 8670.56.5(a) and (h)(6) for loss of profits and impairment of earning capacity incurred, and to be incurred, by Venoco in connection with Venoco's Holly platform being shut-in as a result of the discharge of oil when pressurized oil in Defendants' Pipeline ruptured the wall of the

Tatro Tekosky
Sadwick LLP
ATTORNEYS AT LAW

Pipeline and was discharged to the waters of the Pacific Ocean and elsewhere;

g.  For a declaration holding each Defendant liable for negligence/gross negligence, willful misconduct, interference with contractual relations, and interference with prospective economic advantage, for all further damages for loss of profits and impairment of earning capacity incurred, and to be incurred, by Venoco in connection with Venoco's Holly platform being shut-in because of the facts alleged herein.

h.  For punitive and exemplary damages;

i.  That Venoco be awarded its costs of suit in this matter; and

j.  For such other and further relief as this Court may deem necessary, just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Venoco hereby demands a trial by jury of all issues triable of right by a jury.

Dated: October 19, 2016                    TATRO TEKOSKY SADWICK LLP


                                           By: _/s/ Steven R. Tekosky_
                                               Steven R. Tekosky, Esq.
                                               Attorneys for Plaintiff Venoco, LLC,
                                               formerly known as Venoco, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2016, I electronically filed

**SECOND AMENDED COMPLAINT FOR:**
**(1)  Federal Oil Pollution Act of 1990  (Damages under 33 U.S.C. § 2702);**
**(2)  California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act**
     **(Damages under Cal. Gov. Code § 8670.56.5);**
**(3)  Negligence/Gross Negligence;**
**(4)  Willful Misconduct;**
**(5)  Intentional Interference with Contractual Relations;**
**(6)  Interference with Prospective Economic Advantage; and**
**(7)  Declaratory Relief**
**JURY TRIAL DEMANDED**

with the Clerk of the court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Thomas P. Clancy
Jordan X. Navarrette                          Robert J. Nelson
Brad Brian                                    Sarah R. London
Daniel Levin                                  Lieff Cabraser Heimann & Bernstein, LLP
Henry Weissmann                               275 Battery Street, 29th Floor
Laura Wirth                                   San Francisco, CA  94111-3339
Munger Tolles & Olson LLP
355 South Grand Avenue, 35th floor
Los Angeles, CA 90071


                                              /s/ *Karen L. Roberts*
                                              Karen L. Roberts